## No. 5925.

## S. W. Thurmond v. The State.

1. **Uttering a Forged Instrument—Indictment.**—See the statement of the case for the charging part of an indictment *held* sufficient to charge the offense of uttering a forged instrument in writing knowing it to be forged.

2. **Same—Charge of the Court.**—The pledging of a forged instrument as security for a debt, under an agreement to redeem the same within a specified time, is an uttering of the same within the meaning of the statute, and the trial court did not err in refusing to charge the jury to the converse of this rule, and to the effect that, to constitute the uttering of the forged instrument, it must have been given by the accused absolutely in payment or exchange. See the opinion on the question.

Appeal from the District Court of Colorado. Tried below before the Hon. George McCormick.

The conviction was for uttering a forged instrument, knowing it to be forged, and the penalty assessed against the appellant was a term of two years in the penitentiary. The charging part of the indictment reads as follows:

"That S. W. Thurmond, late of said county, on the first day of May, in the year of our Lord 1886, in the county aforesaid, did then and there, wilfully and unlawfully, knowingly and fraudulently, pass as true to George Herder, a forged instrument in writing, to the tenor following:

"$125.00    On or before the 15th day of October, A. D. 1886, we promise to pay to the order of S. W. Thurmond the sum of one hundred and twenty-five dollars, it being the balance purchase money on a certain tract of land situated in Lavaca county, Texas, described in deed made to us by S. W. and M. E. Thurmond, January 10, A. D. 1885. This note is a lien on said land for the payment of same.

"This January 10, 1885.

"(Signed)                                           P. A. Thurmond.
"Witnesses:                                         C. E. Colbath.
    "J. W. Pullen.
    "T. C. Scott.

"Which said instrument in writing the said Thurmond then and there knew to be forged, and did then and there so pass the same as true, with the intent to injure and defraud; against the peace and dignity of the State," etc.

George Herder was the first witness for the State. He testified that he was the person named in the indictment as the party to whom the alleged forged instrument was passed. Witness resided in the town of Weimar, and was engaged in the mercantile business. In May, 1886, the defendant came to witness's store in Weimar, Colorado county, and asked credit for some goods. Witness sold him a small bill to be paid for on the following Saturday. Defendant paid that bill according to contract, and bought another small bill agreeing to pay on the succeeding Saturday. He not only failed to meet that payment according to his agreement, but proposed to make further purchases on credit. Witness declined to accommodate him, and told him that, in view of his failure to meet his last agreement, he could not get any more goods from him on credit unless he gave security. Defendant then left, but a few days later returned and handed him the note set out in the indictment, and which is in evidence, and asked witness if he could get some goods on that note as security, until October 15, 1886. Witness examined the note and agreed to accept the note as security until the time specified. He then let the defendant have goods to the amount of fifty-six dollars, inclusive of the amount due at the time. Witness declared that he would not have sold the goods to the defendant if he had not deposited with him the said note as security.

Several months after this transaction the witness wrote to Lavaca county about the land described in the note, and learned that it had been sold by one John Woods under a vendor's lien. The witness then delivered the note to T. A. Hill, a banker in Weimar, to be sent to the post master at Somerset, Atascosa county, for the purpose of ascertaining whether it could be collected from the makers. Hill soon returned the note together with a letter from the post master at Somerset, and witness, acting upon information derived from that letter, had the defendant arrested. The note had never been paid, nor had the defendant ever paid for the goods.

Cross examined, the witness said that defendant gave him the note as collateral security for four dollars he then owed him for goods, and for fifty-two dollars worth of goods which he then

delivered to defendant. Upon the defendant's statement that he could and would discharge his debt to witness by October 15, 1886, the witness agreed to hold the note, and not present it for payment until that date. At the same time he told witness that he had contracted to run Vandy Hubbard's engine from the opening of the ginning season, at good wages, and that he could easily discharge witness's demand before or by the maturity of the note. Witness instituted this prosecution on or about September 20, 1886, which was prior to the maturity of his claim against defendant. The State then read in evidence the note as set out in the indictment, except that the name of M. B. Dunham also appeared on it as a witness.

P. A. Thurmond, the brother of the defendant, was the next witness for the State. He stated that he lived in Atascosa county, and had lived there for the five years next preceding this trial. The witness was here shown the note in evidence, and asked if the name "P. A. Thurmond," signed thereto as one of the makers, was his signature. He replied that he was unable to say whether it was or not. He never in his life, but once, signed or executed a land note in favor of defendant. That note was executed by the witness individually and alone, and was never, so far as he knew, signed by anybody else, either as maker, surety or witness. Witness never knew a man named E. C. Colbath. He had brothers-in-law named Colbath, but none of them that he had ever known or heard of was named E. C. Colbath. His acquaintance with the Colbath family, however, was limited. Witness did not recollect that any of the parties whose names appear on the note in evidence were present when he executed the only land note he ever did execute to defendant. But one man was present at that time, and he was going under the assumed name of Kennedy. T. C. Scott was a brother-in-law of the witness, but was not present when witness executed the note to defendant, neither were Dunham nor Pullin present that witness could remember. Witness was absolutely positive that he never executed but one land note to the defendant, and he had no recollection of asking anybody to sign that note with him, either as maker or surety. The note in evidence was first shown to witness in September, 1886, by Mr. Holden, the post master at Somerset, Atascosa county, and witness then told Holden that the note was "no good." Witness, as requested, wrote his signature on a piece of paper, and it was given to the jury.

Cross examined, the witness said that the note executed

in favor of the defendant, was executed by him some time in 1886, at the defendant's house in Caldwell county, Texas. It was for óne hundred and twenty-five dollars, balance of purchase money for a tract of land which he bought from the defendant and their mother, M. E. Thurmond. It was understood in that transaction that the witness was also to pay off the vendor's lien notes against said land, then in the hands of John Woods, the said notes having been pledged to said Woods for moneys advanced to witness's father in his life time. When witness called for the notes, he ascertained that Woods had foreclosed the lien and sold the land, when he dismissed the matter from his mind and never afterwards saw the note executed to defendant on that land, nor any other note purporting to have been executed by him to the defendant, until he was shown the note in evidence by Mr. Holden, in September, 1886. Witness refused to pay the last mentioned note, and told Holden that it was "no good." The witness admitted that he signed one one hundred and twenty-five dollar promissory note in favor of defendant. He could not absolutely swear that the note in evidence was not the note he signed, and he would not testify falsely even to keep his brother out of the penitentiary. According to the recollection of the witness, no other name than his own was signed to the note he executed to defendant, either as principal or surety. He had never seen that note since he delivered it to defendant, unless the note in evidence was the same. Witness and the crowd about him were drinking when he signed the note described by him, and it was barely possible that the note was signed by Pullen as a witness, but witness had no recollection of it. Pullen then lived in the neighborhood, and may, though witness did not read it, have been present when he executed the note.

P. F. Holden testified, for the State, that he was post master at Somerset, Atascosa county, Texas. In September, 1886, he received a letter from T. A. Hill, post master at Weimar, Texas, enclosing a note purporting to have been executed by P. A. Thurmond and E. C. Colbath to S. W. Thurmond. Hill requested witness to see Colbath and P. A. Thurmond about the note. Witness presented the note to P. A. Thurmond, who said that it was "no good." Witness then returned the note to Hill, writing him exactly what P. A. Thurmond said about the note. The note in evidence was the note referred to by witness.

T. C. Scott testified, for the State, that he was the brother-in-

law of defendant and P. A. Thurmond. He examined the note in question, and declared that the signature of "T. C. Scott" as a witness was not his signature. He never before saw the said note.

The State closed.

Vandy Hubbard testified, for the defense, that in the spring of 1886, he contracted with defendant to run his engine when the ginning season should open. The cotton crop failed, and witness did not employ him.

Second witness introduced by the defense testified to the irreproachable reputation of the defendant for honesty and fair dealing.

No brief for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. Exceptions to the indictment were properly overruled, as the indictment follows the statute, and is in accordance with precedents. (Penal Code, article 443; Johnson v. The State, 9 Texas Ct. App., 249; Wharton's Prec., 315, 316.)

Upon the trial defendant requested the court to instruct the jury as follows: "Knowingly passing as true such forged instrument as described in the indictment is putting such forged instrument off in payment or exchange. Pledging, however, such instrument in writing, to be redeemed at a future day, is not a passing within the meaning of article 443 of the Penal Code, under which defendant is being tried. The forged instrument alleged to have been knowingly passed as true purports to be what the law terms a negotiable bill of exchange, and which is negotiable in law only by the indorsement of the payee, that is, by the party to whom the bill is made payable, which is done by the act of the payee writing his name across the note, and the like, which, when done by the payee and delivered to the purchaser for a valuable consideration, passes the legal title to the purchaser, and without such indorsement no legal title to the bill can pass to the purchaser. And, though you may believe from the evidence that the written instrument described in the indictment was a forged written instrument, and that the defendant pledged the same to George Herder with an understanding that it was to be redeemed at some future day by him, it is not knowingly passing as true a forged instrument in writing within the meaning of article 443 of the Penal Code, and you

will acquit the defendant." Said instruction was refused by the court, and defendant excepted.

It can not be questioned that the instruction would have been applicable to the evidence. We are of the opinion, however, that it is not the law, and was properly refused. It has been held in one case, by a divided court, that a mere *pledge* of a written instrument was not a passing of it. (Gentry v. The State, 3 Yerger, 451.) The opinion in that case cites no authority and advances no reason for its support, merely declaring that pledging a note is not passing it, within the meaning of the statute. Mr. Bishop, in his work on Statutory Crimes, questions the correctness of the decision, and suggests that there is no difference in principle between passing a thing in pledge and giving it in conditional payment. (Sec. 308.) We agree with Mr. Bishop. We can see no difference in principle between pledging a note as security for the payment of a debt, and delivering it in payment of a debt with the agreement that it should be taken back if it proved to be not genuine. (Perdue v. The State, 2 Humphries, 494.)

We think that, to constitute the offense defined by article 443 of the Penal Code, all that is required is that a person, knowing that an instrument in writing is a forgery, deliver it to some other person as true and genuine, with the intent to thereby injure or defraud. It matters not, we think, that the complete legal title to the instrument does not pass by the delivery. The instrument itself is passed; its possession is changed, and this change of possession, accompanied by a knowledge on the part of the accused that it is a forged instrument, and by the intent on his part to defraud, constitutes the crime as completely as if the legal title to the note passed with the possession thereof. In the case before us the defendant delivered the note to Herder as security for the payment of the price of merchandise purchased by him of Herder. He delivered the note to Herder as a true note, and as such Herder received it, and delivered the merchandise. The evidence sufficiently shows that the note was forged, and that the defendant, at the time he delivered it to Herder, knew that it was forged. As we view the case, there is no error in the conviction, and it is affirmed.

*Affirmed.*